Good morning. May it please the court, my name is John Derrick and I represent the appellant Don Campion who is present in court today. There's one page in the excerpts of record at page 266 which I think is particularly telling in this case both for what it does illustrate and also for what it doesn't illustrate. And that's a trial exhibit. It's a photograph which shows one of these power transmission lines. And it towers. In the photograph it's a full size of the page. And right at the bottom you see this, what appears to be this very small van, but it's a normal full-size van. And it just goes to show the giant nature of these towers which extend for three miles across this. And there were other towers on the property, right, besides the ones in question? There were indeed. And how tall were they? I believe that the height of those towers was smaller. They may have been getting up. Indeed, the towers, they're not all of a uniform height even in the path 15 ones that we're talking about. But those ones were sort of off-center. They didn't run right through the center. This one runs right through the middle. Runs right through the center. But what this photograph doesn't, of course, show are the EMFs. And if EMFs were visible, if they were to look like blue lines which came out radiating, then we probably wouldn't be here today because the jury would have seen them and would have been able to factor it all in. But before we get to that, I want to be sure I understand one other element of this case. The testimony was that the highest and best use of the property would be as a residential subdivision, and yet the general plan called for its use as agricultural land. Is there anything in the record that indicates that the zoning body was prepared to change the zoning to residential? Well, I mean, there was extensive argument about the highest and best use. And I think my best answer that I can give to Your Honor's question on that is that the jury reached its decision on that, and that's what the trier of fact found from all of the evidence. Was there a special verdict with respect to that issue? No, there wasn't a special verdict form, but it's the only way in which one can make sense of the jury verdict because they came up with this before valuation, which could only have meant that they believed Mr. Campion's appraiser as to the highest and best use. Was the water issue likewise factored into that, the ability to have water available? There was a lot of testimony about all of these issues and argument, and they came up with this valuation which was pretty well, pretty close to Mr. Campion's before valuation. The government's one was well off that. What did the damage to your client's interests where the jury, as you wanted them to, I'm sure, accepted the pre-Powerline value as the highest use would be residential, but then contrary to both your position and the government's, they said the value of the property after the Powerline term is still residential. Indeed. And Your Honor's observation is right. I mean, the jury in its after valuation, it didn't agree with anyone, and that's, you know, what juries are there for. And so the quick question, Your Honor, then is, well, if they had been put in the shoes of the fully informed buyer, would they have or may they have reached a different decision on that? And the heart of the issue in this case is that they did not get all of the information that the fully informed buyer would have had. Well, in this particular instance, the jury obviously did take into account the EMF factor and gave, I think, a $2.06 million verdict. You wanted a much greater one. And I guess the issue that we have to wrestle with here is, is there any scientific basis for quantifying the effect of EMF, and how was that? How does one measure that? Is there any scientific basis for it? Well, I don't think that the issue is quantifying the effect, if by effect one means the health effect. It's quantifying the reaction. Well, I think that the way I would frame the issue is quantifying the presence. In other words, are these things there or not beyond the easement? And if so, how far and in what quantity? And throughout this litigation, the government has never, I believe, made an argument that the statistics of the data that Cindy Sage, the witness whose testimony is at issue, that the data she would have presented on the issue of presence is unreliable. They've never said, you know, she's using bad measuring techniques, the numbers will be different. Now, doesn't that put the cart before the horse, though, Counselor? The issue here is, is there evidence that's admissible, that's scientifically reliable, to determine that even assuming arguendo that the EMFs are there, that it will have a certain adverse impact and a quantifiable impact based upon how far you are away from the towers? Well, an impact on what would be my answer to that question? On the price that a willing buyer is willing to pay. Okay. Well, this then comes to the ‑‑ and that's not so much a scientific issue as it is a marketer one. It is in terms of whether ‑‑ I mean, ultimately our role here is to determine whether the district judge abused his discretion in failing to permit certain testimony that you wanted to get in. And his determination is based upon the rules of law determined by the Supreme Court, at least as interpreted by the Supreme Court, in terms of whether something is scientifically sound. That's really what it boils down to, isn't it? Well, except that in this case, I don't think it is an issue of science. Were Mr. Campion to have been wanting to litigate the health effects ‑‑ I think that's stipulated pretty much, isn't it, that you're not litigating. Exactly. We're not litigating. Right. But I think that the government's case has always been that the issue of the presence and extent is some sort of a surrogate for trying to really cast doubts about the health effects into the jury's mind. Because the government itself, first of all, the government itself has always agreed that these EMFs do extend. The government indeed opened the door to allowing evidence about this when it stated that it had no objection to its own witness, having said that they go beyond the easement boundary. So there was evidence then before the jury of the presence of the EMF and the extent of the EMF, correct? Well, there was evidence about the presence but not the extent. And this came out because the government's own witness from the power company said under, I believe it was direct examination, of course EMFs do extend beyond the boundary. And then there was then a colloquy outside the presence of the jury about that soon afterwards. And the government said then, that's fine, we're not going to, you know, ask for our own witness' testimony to be struck on that. However, when the appraiser, Mr. Campion's appraiser, tried to refer to the same thing but went a stage further and talked about how far it went, at that point the government said, oh, no, you can't do that. And the court indeed gave the limiting instruction. But wasn't the part of the problem there was not just the testimony itself, but how it was being presented? The court found that it was prejudicial or unduly prejudicial in the sense that it was being portrayed using these red lines. And it's also – so it's not just a matter of the relevance of it, but it's also under 703 the prejudicial effect. Well, I mean, I – Our question then, of course, is whether all of that taken together was an abuse of discretion. I don't think that – I don't believe that it was so much the kind of those charts. If you look at those charts at kind of page 106 and 108, I believe, the exits of record, I don't believe that it was so much the formatting of those charts. I think it went very much to the fundamental issue that the prejudicial effect that was referred to was really that it's going to confuse the jury because they're going to somehow think that you're talking about – that you're talking about the health effects. And I think that's the issue. And that could have indeed been addressed by a limiting instruction. But to return to Your Honor's question about the – you know, don't you need to have some – I mean, scientific may not be quite the right word, but some proper basis in order to even go forward of showing that this does impact value. Well, I mean – well, actually, perhaps maybe I misstated it or you misunderstood it. Clearly, the jury was allowed to hear evidence that there are EMFs, and the jury made a determination that it did impact value. The question then is, are you also allowed to say that the EMFs are – as you go out from the easement, the amount of EMF power, if you will, decreases and it has this impact on value as you go out. Isn't that part of the prejudicial issue and the scientific issue? Well, if I could answer that in two stages. First of all, I would disagree with the premise in the question, which is that the jury did make a finding that EMFs impacted value. It's true that they did award some severance damages because the compensation appeared to be for more than the buildable value of the easement alone. But that could have caused – That could have only been ascribable to the EMFs, right? Well, not necessarily. It could have been because of the visual impact. It could have been for – you know, these things aren't particularly pleasant to look at. It could have been for other reasons, because there were other reasons litigated. So – and – but that kind of premise aside, I think the reason why not only can you, but you must put this evidence in, is that if you just tell the jury, well, look, you know, the public doesn't like EMFs and they may pay less for the land, but you don't tell them whether there are EMFs there or whether they just go for 6 inches or for 6 miles or for 600 yards or whatever, how does the jury factor this in? And there were two parts to Ms. Sage's testimony which were excluded that are on appeal. One is the types of questions that buyers of this type of buildable land, usually developers ask, and then would have been testimony about had they asked those questions here, this is the – these are the answers they would have given. And if the role of the jury in an eminent domain case is to, as it were, simulate the free market, you've got to have this information, because in the free market, there isn't a district court judge presiding over the transaction trying to regulate the questions that can be asked and answered. These – these – this information comes out. And there's a comment of the trial judge in there somewhere saying that there's really been no effort to qualify this EMF information under the rule of evidence 702, in other words, to establish its reliability and so on. Well – In other words, to make it admissible as a subject of expert testimony. Well, the – the – the – again, I would throw the question back by saying the reliability of what, because the reliability of the measurements were not at issue. The reliability, I suppose, of the measurements. Yeah. I think you – there is nowhere in the record where the government says we disagree with or consider unreliable the actual EMF readings. That wasn't the government's case at all. And just by way of – as a background comment, you know, it's not very difficult to make these readings. I mean, people do it – do them all the time. The power companies themselves do them. It's fairly kind of, you know, low-grade technology. So the tricky issue is not so much, you know, can we come up with reliable readings? The tricky issue is, well, you know, what should – you know, what do we then do with the readings in terms of who can see them? Don't you have a – it's kind of a conundrum in a way, and I have empathy for you, but the maps that were prepared were not admitted, showing that, if you will, zones of EMF transmission, it implies to the jury something about the land's value despite the fact that the parties agree that there's no factual basis to believe that the EMFs are harmful, have adverse health consequences, or anything else. And given that basis, how can you quantify the adverse impact of something that the parties agree there's no scientific basis to say that it does harm people? Let me offer an analogy in answer to that question. Assume that the property at issue is an apartment on the 13th floor of an apartment building here. And assume that you have appraisers who come in and say, for superstitious reasons, which are obviously ridiculous, nobody wants to live in a 13th-floor apartment if they have a choice, and it'll always be 20% less expensive than the 12th or the 11th. And assume, basically, that in this eminent domain case, the appraisers – that comes in. The jury can hear about the public perception of the 13th floor, as indeed in this case they heard about the public perception of EMFs. But the jury doesn't hear, well, was this on the 13th floor? In other words, you can offer evidence about how even if it is an irrational fear, an irrational fear can impact market value. And in my 13th-floor analogy, it would be terribly unfair for this person who was trying to get compensation for the 13th floor if that piece of the puzzle was never put in, because the jury would probably think, well, I guess he can't prove his case that he fell under the 13th-floor category. And that's the problem here with what happened here. They heard the evidence that the public doesn't like EMFs. They even heard the government say, and you know what, they did go a bit beyond the jury room, but Mr. Kempion didn't tell us, didn't give us any evidence. Well, then if you get – if you get evidence that there's some EMF in some of the farther reaches, then I suppose the government has to come in and say, you're getting more EMFs from your cell phone or something than you get from this. And will that then have an effect? I mean, EMFs can come from different types of – I mean, all types of electrical equipment are there. But of course, when they were measured, they were measured when this was – you know, there was no other equipment besides the power transmission lines to cause it. So everything that was there would have been there. But let me just point out one maybe obvious thing, which is obviously reasonable minds can differ, and that's why we have trials. We give the jury the facts, and we have vigorous cross-examination. And there's a good Fifth Circuit case that I cited to, I believe, in my reply brief that points out that in eminent domain cases, you know, in particular, one has to be very careful about using the admissibility of evidence as a means of resolving these issues. These were jury issues. I'm mindful of my time. And we'll – because we were asking you questions, we'll give you a little more time. But if you want to hold that good thought, and we'll have you come back and do your rebuttal in a minute, okay? Indeed. Thank you, Your Honor. Very well. We'll hear now from the government. Ms. Sprague, right? May it please the Court. I'm Mary Gay Sprague with the Department of Justice representing the United States. Mr. Campion seeks to set aside this jury verdict reached after seven full days of trial because the trial court, after careful exercise of his discretion, chose to exclude one portion of a supporting witness's testimony. What's the government's response to the interesting analogy about the 13th floor? Your Honor, I believe that in this case, the jury did know that we were on the 13th floor. And where did they know that from? From the testimony of Ms. Cindy – I've forgotten her last name. Cindy Sage. They knew that from the fact that the trial court allowed Ms. Sage to testify about public perception of EMFs, electric and magnetic fields. So the jury was basically allowed to make assumptions but have no presentation as to quantity or anything of that nature. That's correct. And I believe that the trial court's distinction in this regard was correct. The United States' position going in was that there should be absolutely no testimony about EMF, because after 30 years of studies, there's still no scientific proof that there is harm. But the judge said, well, out there in the market, people might be afraid, and Mr. Campion's entitled to have the jury know that. Just like the pictures can come in, the jury can look at the photos, witnesses can talk about crackling from power lines. These are things that the jury can take into account in evaluating the expert testimony about market value. But what good does that do if you don't know the extent to which the EMF extends? Your Honor, there are all kinds of market studies that could have been done that Mr. Campion didn't do. The testimony here, interestingly, did not isolate out the effect of EMF on this planned development. Mr. Watson, the land planner, Mr. Gimme, the appraiser, both testified it's the totality of the impacts. It's the visual impact. It's the noise. It's the possible fear. It's the possible fear that these could fall over. People don't like them. They didn't segregate out in their opinion the EMF part of the public perception. What they could have done was comparable sales. That's what appraisers typically do. You can go out and you can put on evidence that here's a property and it's got a power line here, this is how much it sells for, otherwise comparable property, no power line, it's this much more money. Mr. Gimme, the appraiser, didn't put on that testimony because the strategy in this case was not to show diminished value. It was to show no development potential left, total wipeout. So they didn't want to talk about lower value. They needed to show, they wanted to show the jury, no development potential at all. So understandably, no comparable sales were offered. And the judge said, okay, I'm kind of concerned about your strategy, but that's your decision to make. The next thing they could have done was, okay, do a market survey. What do developers do with respect to setbacks from power lines? Go out and talk to 100 developers and ask them, there's a big old power line, do you build up to the edge, do you give 100 feet, do you go back 200 feet, what do you do? The judge expressly said this, bring me the survey data. The United States said on November 2nd, Your Honor, we'll give them a continuance because there's no data here. If they want to link this up, they can link it up, bring in the data. They didn't do that analysis. So in this record, we don't know. What is the standard out there? We don't know. The next thing they could have done if they really wanted to isolate the effect of the EMF was to do a market survey directed to EMF. Go out and ask people, how do you feel about milligausses? You're going to get a range of responses. Somebody might say, a developer, I never heard of a milligauss. I'm too busy worrying about the energy efficiency of the heating systems I'm putting into these homes. I don't even know about that. Another developer might say. Would the second thing that Ms. Sage was offering go to that point?  Your Honor, the court noted at one point that Ms. Sage didn't even give evidence about the responses of the developers that she consulted with, let alone developers out there in the land. At the supplemental excerpts of record 35 to 36, this was during the October 28 hearing, the trial court said, where is that? So I can look and say, oh, okay, she's been consulted by 20 developers on this very issue and she has advised them of concerns and that they have responded accordingly because she was asked, well, do you know of any developments where they didn't develop close to a power line? I think she said, not personally. The experience that Ms. Sage had as to what she was generally allowed to testify about was in a range of areas, but it was never clearly presented any instance in which she told a developer who was thinking about buying property, you're going to need a 1,000-foot setback, and the developer says, okay, then I'm not going to buy it. Or that she says, I think you should have a 250-foot setback, and he said, I'm not going to buy it. Or, you know, I'll buy it, but I'll pay less money. There was nothing specific. There was just the general aura. So from the government's perspective, then, the plaintiffs could have presented their case, gotten what they needed to in to evidence in the ways that you've described, but instead chose to apply this other approach in the hope that it could have the whole property deemed undevelopable. Is that your government's position? That's correct. In this trial court, it's hard to imagine a more careful exercise of discretion. There were four separate hearings on this issue before trial even began. There was the October 17th hearing, and the judge said, you're not telling me how this EMF value, the EMF numbers link up with market value or the developer's decision. So come back. Let's get some supplemental briefing. Come back. There was supplemental briefing, a second hearing on October 28th. And the judge said again, you didn't come back to me with any market data here. I'm still not hearing anything. And so he said, I'll give you another chance. Bring me an offer of proof. So the offer of proof came in on October 31st. And then there was a long hearing on November 2nd. And he went through all of the steps, and he said, I'm going to give you public perception because that's like the visual impact, that's like the auditory impact. We'll let the jury assess it. But he said, you know, I'm still really confused because I still don't understand what Ms. Sage's testimony has to do with your land planner and your appraiser, because that's where the action is in this just compensation trial. And Mr. Campion's counsel went back and forth, back and forth. The record reflects. Did they rely on her? Didn't they rely on her? The problem was that if Watson and Gimme didn't rely on her for their opinion that there could be no development here, then what is she doing here? But since the judge said that any line drawing is implicitly unreliable, even if she doesn't say inside the line, bad for your health, outside the line you're okay, if they did rely on her, then what is the basis for their opinion that there can be no development? And so counsel had to go back and forth saying, yes, they relied. No, they didn't rely. Yes, they relied enough to get her in. No, they didn't rely enough to boot their opinions out. Because the United States came back after the November 2nd hearing with another trial brief which incorporated another motion in limine and said, we've had three hearings. There's still no link-up between these numbers and the ultimate opinion here on development potential and market value. And the Court held a fourth hearing on November 8th. And, Your Honors, I have to apologize because this, the transcript of this hearing was not included in the supplemental excerpts of record, and it certainly would have been helpful had it been. But on the first day of trial, transcript volume one from pages 188 to 213 is the transcript of this fourth hearing on the EMF issue where the judge very clearly laid out each of the decisions and said on the specific numbers, the milligauss numbers, they're not coming in because that's an implicit opinion about harm. That is unreliable. The United States had said, then she shouldn't talk about perception either because she had no survey data for that. And the trial court said, no, I'm not going to say she needs survey data to even testify that there's a perception out there. That can go ahead. Then the issue came up again. Well, what about Watson and Gimme? The United States said they rely on her. They have nothing else to go on for their opinion that there's total wipeout of development potential. They should be excluded. And they had nothing because they had not put together comparable sales or things of that nature. They had no comparable sales. They had no market surveys. They had in their professional experience, I'm a land planner, I'm an appraiser, I'm looking at this. Based on my experience, people don't like power lines and nobody's going to buy this property. That was the opinion. Well, did they, did Gimme, for instance, purport to be basing his opinion at all on Ms. Sage's measurements? Your Honor, it's unclear. Mr. Gimme, in fact, had his own expertise in EMF in the market. He had attended an institute where this was the issue. He read articles about it. He wrote, he did his own valuations in the 1990s, comparable sales of homes near power lines and homes away from power lines so that he didn't really need to rely on Ms. Sage to know that there was a perception in the marketplace. So I can't answer your question because counsel went back and forth representing he did rely and then representing that he didn't rely. He didn't testify to a specific setback number. Mr. Gimme never said you have to be 1,000 feet back. He just said it's just big enough that you're going to fragment this development and no one would buy it for any price at all. And the reason, one reason I asked, of course, is that the district judge discusses Rule 703, which would normally be talking about data on which the expert relies and whether or not it would be prejudicial to let that come before a jury or whether it should be held back. And he said, well, it should be held back. But I guess he's treating it in case it's part of the foundation of his testimony or something. Correct. Right. And his ruling always was I'm going to let Ms. Sage testify because it might be a foundation for their testimony, the land planner and the appraiser. And I don't want to deprive Mr. Campion of that foundation. I want to address the kind of central thesis here, which is that the prudent buyer standard trumps the Federal Rules of Evidence because buyers hear all kinds of stuff out there in the marketplace that wouldn't be admissible under the Federal Rules. And I think that is really a false dichotomy here. The trial court felt it had an obligation to apply the Daubert-Kumho-Tyer standard to Ms. Sage's testimony, and it did. It said there just is not sufficient evidence of harm that EMFs cause health effects that I'm going to let you testify about specific levels and draw lines on a map. But he, you know what? I just lost where I was going right this second. Oh, but, excuse me, Rule 702. He had said during the October 28th hearing that you are telling me that the prudent developer reads all these reports that Ms. Sage does. I don't think that's true. You're going to have to show me that they do. And if Mr. Campion had come back with a survey of developers and it appeared that they all know about this, they read all these reports, then the prudent then it would have been relevant probably to let some of this evidence about harm in because that's really what the market was referring to. So the trial court even allowed that it would have to modify Daubert if it really was critical, if the developers really made their decisions based on this kind of evidence. But Mr. Campion never came back with that proof to the trial court that in the land out there, developers really are relying on this kind of evidence. And so for that reason, in this case, then, the Federal rules of evidence were properly applied. Of course they apply in just compensation trials. They don't trump the rules. Mr. Campion was trying to posit the extraordinarily prudent developer. And that isn't the standard here. And the cases in the Ninth Circuit that talk about the buyer of ordinary prudence are in the opening brief. Mr. Campion's brief on page 32. Kennedy. Well, which rule is keeping out the information, then? I believe there are a number of links, but it's rule 702, the Daubert and the Kumho application, that keeps out Ms. Sage's line drawing. Now, that's what, if I understood it, opposing counsel, he said that there's never been any dispute about the accuracy of her measurements. There's two issues there, Your Honor. I think it was not in dispute, the question that if you walk out after you have And I'm not even sure that Ms. Sage measured that. I think that those kinds of that determination is a matter of modeling and physical formula, and you put in the amperage of the electricity, and then you know at this distance this is what your magnetic field is. So that's the problem. There was no evidence of public perception based upon how far out. Right. The public perception isn't that, oh, my God, there's five milligausses here. The public perception is I'm standing 200 feet away from this power line, and I don't like the way it looks, or I don't like the way it sounds. And further, you're suggesting there's no market analysis tied to that public perception. That's absolutely correct. The judge kept saying, why do we talk about their state of mind? Just tell me what developers do. It's almost a relevance objection. I mean, you're saying there's no link. The measurements aren't disputed, but there's no link between the measurements and market behavior. That's right, Your Honor. I think that relevance has its role, that Rule 702 has its role. And then, of course, there's the backup of Rule 403, that if, even if there is some danger of prejudice, the danger that the jury would return with a high verdict because of some unquantifiable fear of EMF outweighed the minimal relevance of telling them it's this many milligausses at this number of feet from this power line. This Court only had to get it right under one rule. If it got it right under 402, 403, or 702, this jury verdict stands. This trial court bent over backwards to give Mr. Campion every opportunity to bring in evidence that would be admissible in this trial. With respect to Mr. Watson and Mr. Gimme, the United States moved to keep them out, as I said. And the judge said, no, because I'm going to let it in. He said, it's a close call, but that's the evidence they're going with. They're going with this all or nothing. I'll let it in. I'll let the jury hear the evidence and assess its weight. And that's exactly what the jury did. The trial judge predicted what this jury was going to do. As he was trying to work out relevance, he was assessing it against the theory that was presented, but also possibly the theory the jury might be interested in, and he put his finger on exactly what this jury was going to do based on what was presented to them. Thank you very much for your presentation, Ms. Sprague. Mr. Derrick, if you'd like to use, I think we had 246. Let's give him four minutes, because we were using part of his time in questions. Go ahead, then, if you will. Thank you, Your Honor. On the issue, I think, I believe it's Judge Canby's question as to whether the record shows that Gimme relied on Sage. And counsel kind of casts some doubt as to whether he did, says it's unclear, and then seems to suggest that he didn't. I'm interested, if I may follow up on something that Ms. Sprague indicated. She illustrated a number of alternative ways that Mr. Campion could have gotten evidence into the record that would have dealt with the public perception and the fair market value and so on, such as comparable sales, market analysis, and so on. Does the record indicate why that was not done? Well, I'm not sure that the record sort of indicates why certain things were not done. But what the record does indicate is that the government was determined to stop any mention whatsoever of EMFs if they could help it. It's also clear that the judge did let information in. And apparently, again, I'm taking at face value what Ms. Sprague said, apparently the district judge repeatedly asked Mr. Campion to provide this other kind of information, and if I understand correctly, it was not forthcoming. Does Mr. Campion dispute that? Well, I think I dispute it in the sense that this notion, for example, that Mr. Campion could have presented evidence of a survey, but surely that's precisely what Ms. Sage's testimony about the types of inquiries that buyers come to her involves. So I can't quite see why if Sage had gone out and done a survey, that would have been fine. But if people come to her saying, please find this out for me, she can't testify about that. So this notion that there was this huge breadth of opportunity to litigate the EMF issue, which Mr. Campion chose to ignore, I think is at odds with the reality of this case, which was that Mr. Campion was fighting to bring as much stuff in about EMFs as possible, probably more so than what we're now arguing he should have been able to do, in fact. The government was saying, we want as little as possible. And what was the ñ when you first got up, you started to address something in response to it? Yes. I mean, you were asking, Your Honor, I believe, about the extent to which the appraiser relied on Mr. Gimme. And the counsel sort of indicates, well, it's unclear that he did anyway. So as though to say that Sage's testimony was irrelevant. But if you look at page 169 of the excerpts of record, there the court asks this question, does he rely on Ms. Sage for about the setback, in fact, specifically? Counsel for Campion says yes, he does, and explains why. And then the government attorney gets up and says, that's why we've been so concerned on behalf of the plaintiff, Your Honor, is that Mr. Gimme used Ms. Sage's EMF setback to render his opinion that the whole thing is basically rendered virtually worthless. And then Mr. Sage's own report also references ñ sorry, Mr. Gimme's report references the Sage report, its supplemental excerpts of record 9 and 11. And then at trial, he began to try to talk about the whole EMF issue before he was cut off and his testimony was struck. So I think there is this connection. I want to make one other analogy, lots of things I'd like to say, but I'll make one analogy about what happens if the government wins in this. It can come back to bite them. Next time there's one of these cases, and let's say the buildable land was five miles from the power line, the landowner can get up and say, oh, public perceptions ñ talk to the jury about the terrible public perceptions of EMFs. But, of course, the government wouldn't be able to say this is ridiculous because there are no EMFs there. This is absurd. How can you talk about this being a factor? It's five miles away. EMFs don't go that far. Well, that would be a perfectly reasonable line for the government to take. But if they can take that line, why can't Mr. Campion say, well, look, there are these Very good. We thank you both for your very well-done presentations. The case of United States v. Campion is submitted. The Court will stand in recess for five minutes, and when we return, we will hear the case of United States v. Sawyer. This Court stands in recess.
judges: Canby, Smith, Larson